294 So.2d 867 (1974)
TOWN OF WINNSBORO, Plaintiff-Appellee,
v.
BARNARD & BURK, INC., et al., Defendants-Appellants.
No. 12147.
Court of Appeal of Louisiana, Second Circuit.
February 12, 1974.
Rehearing Denied March 19, 1974.
Writs Refused May 17, 1974.
*870 Dale, Owen, Richardson, Taylor & Mathews by George Mathews, Baton Rouge, for Barnard & Burk, Inc.
Sanders, Miller, Downing & Kean by Robert A. Hawthorne, Jr., and Gordon Kean, Jr., Baton Rouge, for J. H. Jenkins Contractor, Inc. and The Travelers Indemnity Co.
Duplantier & DeMartini by Edward J. DeMartini, New Orleans, for Delta Testing & Inspection, Inc.
Wray & Robinson by W. P. Wray, Jr., Baton Rouge, for amicus curiae, The Associated General Contractors of America, Louisiana Highway, Heavy, Municipal and Utilities Branch.
Chaffe, McCall, Phillips, Toler & Sarpy by Jarrell E. Godfrey, Jr., and Peter A. Feringa, Jr., New Orleans, and E. Rudolph McIntyre, Winnsboro, for plaintiff-appellee.
Before BOLIN, HALL and WILLIAMS, JJ.
En Banc. Rehearing Denied March 19, 1974.
HALL, Judge.
This is an action by the Town of Winnsboro to recover damages arising out of alleged defects in a street system constructed in the Town in 1965 and 1966. Named defendants are (1) J. H. Jenkins Contractor, Inc., the general contractor; (2) The Travelers Indemnity Company, Jenkins' bonding company; (3) Barnard & Burk, Inc., an engineering firm; and (4) Delta Testing & Inspection, Inc., a testing laboratory. Jenkins, Barnard & Burk and Travelers named Delta as a third party defendant.
The district court rendered judgment in favor of plaintiff against all defendants in solido in the amount of $445,000, and against Jenkins and Travelers in the amount of $60,000 for attorney's fees. Jenkins, Travelers and Barnard & Burk appealed suspensively. Delta perfected a devolutive appeal. Plaintiff answered the appeals, praying that the award be increased to $475,000.
For the reasons hereinafter set forth, we amend the judgment to reduce the principal award to $175,000, and, as amended, affirm the judgment of the district court.
Factual Background
In 1964, the Town undertook negotiations with Barnard & Burk relative to resurfacing existing streets and construction of new streets in Winnsboro. Barnard & Burk had served as engineers on a previous project in which T. L. James as contractor in 1951, constructed the streets to be resurfaced. Ultimately, the Town contracted with Barnard & Burk to provide the engineering services, including preparation of plans and specifications and supervision of construction, for the proposed project. The Town contracted with Jenkins as general contractor for the project and with Travelers as surety for Jenkins. The Town also contracted with Delta to perform certain testing work.
The project consisted of the resurfacing of the streets originally constructed by T. L. James in 1951 and the construction of approximately 8.74 miles of new streets at a total contract price of approximately $550,000. This litigation relates entirely to the construction of the new streets. Of the total contract price, the cost attributable to the new streets was approximately $500,000.
The plans and specifications called for the new streets to have an asphalt surface over an eight inch soil cement base. Some of the streets were to have concrete curbs and gutters.
Work on the project commenced in the fall of 1965 and was substantially completed in June, 1966. Some base failures appeared during the course of construction and were repaired. In June, Barnard & Burk recommended acceptance and final payment, but the city refused because of certain defects. A "punch list" of defects *871 and needed work was prepared and in July Barnard & Burk again recommended conditional acceptance and final payment. An acceptance was executed in July, but the Town continued to withhold final payment and was making demands for correction of deficiencies as late as October, 1966. Finally, under threat of litigation, the Town made final payment to the contractor with the understanding that the items on the punch list would be taken care of by the contractor. Some further work was done by the contractor but the evidence is not clear as to whether all of the items on the list were repaired.
Additional defects became apparent thereafter and in April, 1968, the Town representatives contacted and met with representatives of the engineering firm, contractor and testing laboratory. The parties were unable to reach an agreement as to what was to be done about the claimed defects and this suit was filed in June, 1969.
Nature, Extent and Cause of the Alleged Defects
The deficiencies complained of by plaintiff fall primarily into two categories: (1) failures of the soil cement base, and (2) defects in the curb and gutter construction. Failure of the soil cement base means that the base is not structurally sound and is inadequate to support the surfacing and traffic load thereon. Manifestations of base failure are caving, or giving way, or deterioration of the streets resulting in cracks, indentations, potholes and the like. Manifestations of curb and gutter failures are misalignment and subsidence, resulting in inadequate drainage.
The parties to this litigation produced an array of expert witnesses. Their qualifications and testimony were reviewed and analyzed in detail by the trial judge in his thorough, well-written reasons for judgment. We are in substantial accord with the factual findings of the district court and, therefore, will not burden this opinion with a repetition of that court's detailed discussion of the evidence. We will, however, review the primary thrust of the evidence presented and the ultimate factual conclusions to be drawn therefrom.
Plaintiff's key witnesses were Glenn Baker and Guy F. LeMieux. Baker is a mechanical engineer and registered land surveyor from Winnsboro, with limited experience with soil cement streets specifically, but with considerable experience in street and road construction generally. LeMieux is a civil engineer and an executive officer in a New Orleans engineering firm with substantial experience in soil cement street construction.
Baker undertook a detailed inspection of the newly constructed streets commencing in November, 1970, and continuing until the time of trial. He prepared an exhibit showing several hundred defects which he located and described on a street by street basis. His exhibit, supported by his testimony, gives his opinion as to the cause of each defect and the work required to remedy it. During the course of his investigation, Baker made or had made numerous visual, physical and chemical tests.
Baker found that the soil cement base was not more than three inches thick in most places, that there was no soil cement at all in some places, that in some places the soil cement never had adequate water mixed in and, therefore, never set up. He attributed most of the defects in the streets to improper or unsatisfactory soil cement base.
Baker found misalignment and subsidence of curbs and gutters, attributing these defects to improper backfill and to improper alignment at the time of construction.
Other defects noted by Baker were improper joints where work stopped and started from day to day, improper junction of one street with another, improper backfill and base over culverts, improper patching during construction, failures around *872 manholes and valves, and inadequate drainage.
LeMieux made his first inspection of the streets in June, 1968. He noted a number of failures in the base and/or subbase, manifested in potholes, depressions, longitudinal cracks, "alligatoring" cracks, and failures next to the curbs and gutters. The failures increased each year thereafter.
LeMieux also made chemical and physical tests. He concluded that the soil cement base was improperly constructed, primarily due to a failure to achieve a homogeneous mixture of soil, cement and water. He noted that the specifications called for a single pass stabilizer machine, but that the contractor used a multiple pass machine with which it is more difficult to achieve the desired results.
Defendants' chief expert witnesses were Edward W. Evans, Dempsey White, Charles N. Higgins and Ray Burgess.
Evans, called by Jenkins, is a consulting engineer with a New Orleans firm, specializing in civil engineering, particularly roads, streets, highways, drainage and similar types of work. He has bachelor's and master's degrees in civil engineering, with twenty-five years experience in design, administration, constructing supervision and inspection of soil cement streets. Evans inspected every item on Baker's list and expressed an opinion on an item by item basis as to many of the claimed defects.
Higgins, witness for Delta, is a licensed civil engineer serving as Assistant Materials Engineer for the Louisiana Department of Highways. He has conisderable experience in and has done special studies related to soil cement roads and streets. Higgins reviewed each item on the Baker list and testified as to his opinion on many of the claimed defects.
White is Chief Construction and Maintenance Engineer with the Louisiana Department of Highways, with a degree in mechanical engineering. He made a detailed review and inspection of each item on Baker's list and expressed an opinion on each claimed defect through an exhibit filed in evidence in connection with his testimony.
Burgess is Director of the Department of Public Works for the City of Baton Rouge and formerly Director of the Louisiana Department of Highways. He is a registered mechanical engineer and registered civil engineer. Burgess did not make a detailed inspection, but made a general visual review of the streets in controversy.
The thrust of the testimony of defendants' experts was that many of the defects on Baker's list were not defects at all and did not require repairs, that most of the so-called defects existing at time of trial were normal in soil cement streets and were the result of traffic and wear and tear over a period of years, that many of the defects were due to or worsened by lack of maintenance on the part of the Town, that most of the claimed curb and gutter defects were minor in nature and did not prevent the curbs and gutters from performing their intended purpose, and that only a few of the defects could be attributed to base failures or improper construction.
The district court concluded there were substantial and widespread base failures due to poor workmanship and improper construction of the soil cement base. It further concluded there were substantial and widespread defects in curbs and gutters due to improper backfill and construction.
We are in agreement with these factual conclusions of the district court.
Plaintiff's evidence consisting of the testimony of its expert witnesses, supported by photographs and some testing and even supported to a limited extent by some fragments of defendants' evidence, is convincing that many of the claimed defects do in fact exist over widespread portions of the street project. Some failures were apparent *873 even before construction was completed and other failures of a similar nature have developed on a continuing basis over the years up to the time of trial. Defects of the nature complained of were recognized and noted by the president of Delta after an inspection trip in April, 1968. The evidence preponderates that there are substantial and widespread base failures and curb and gutter defects beyond what can be expected in a normal, properly constructed street project.
The evidence preponderates that such defects were the result of improper construction. Defendants' witnesses, while basically denying that any defects of a substantial nature exist, would attribute any defects that do exist to normal wear and tear and to lack of maintenance. Undoubtedly these factors have contributed to the present condition of the streets and account for some of the so-called defects included in Baker's list. The evidence is that the Town's maintenance program is virtually nonexistent. Nevertheless, the base failures and curb and gutter defects are so widespread throughout the project that traffic and lack of maintenance could not be logically deemed the cause of all the defects. These defects and failures have manifested themselves both on streets subject to heavy traffic and light traffic and on streets where maintenance and off-street drainage could be and could not be a factor. The early and continuing manifestations of the various failures are indicative of poor construction. Appropriate in this regard is the language of the court in Town of Slidell v. Temple, 246 La. 137, 164 So.2d 276 (1964):
"Then, there is the general inference which so naturally arises in such cases and which permeates these entire proceedings. It is the idea that something is wrong when a project designed as a permanent installation fails in such a short time. It is the thought that the owner has not received what he bargained for. In this case either because the plans and specifications were wanting or because there was faulty workmanship involved.
"When plaintiff established that there was no deficiency in the plans and specifications, the inference then is that faulty workmanship was involved."
Liability of the Defendants
Having concluded there are substantial defects resulting from poor construction, the next issue to be determined is the responsibility, if any, of each of the defendants. The district court concluded that the contractor, the engineering firm and the testing laboratory all failed to perform in accordance with their contractual obligations and that their combined failure in their areas of responsibility resulted in the damages sustained by plaintiff.
(a) Liability of the Contractor, Jenkins
Much of the discussion in the preceding section of this opinion bears directly on the liability of the general contractor to the Town. We have affirmed the district court's factual conclusions that there were widespread defects in the street project consisting of failures in the soil cement base and misalignment and subsidence of the concrete curbs and gutters, all due to bad workmanship consisting of improper mixture of the soil, cement and water making up the soil cement base and of improper compaction of the backfill under the concrete curbs and gutters and misalignment of the curbs and gutters in the construction process. We have affirmed the district court's factual conclusion that there were substantial defects beyond what could normally be expected in a street project and that such defects were not the result of normal traffic and wear and tear or lack of maintenance.
The codal basis for the liability of a contractor is set forth in LSA-Civil Code Art. 2762:
"If a building, which an architect or other workman has undertaken to make *874 by the job, should fall to ruin either in whole or in part, on account of the badness of the workmanship, the architect or undertaker shall bear the loss if the building falls to ruin in the course of ten years, if it be a stone or brick building, and of five years if it be built in wood or with frames filled with bricks."
Article 2762 is not restricted to buildings and is applicable to a project for the construction of streets under the interpretation given to the Article in Murphy Corporation v. Petrochem Maintenance, Inc., 180 So.2d 716 (La.App. 1st Cir. 1965) writ refused 248 La. 910, 182 So.2d 662 (1966).
The contractor contracted to construct the streets in accordance with plans and specifications prepared by the Town's engineers and furnished by the Town. There is no serious contention that the plans and specifications were faulty or inadequate. Thus, LSA-R.S. 9:2771, cited by defendant, which relieves a contractor of liability for deterioration and defects where he has complied with plans and specifications, if the deterioration or defect was due to any fault or insufficiency of the plans or specifications, has no application to this case.
The specifications were violated in at least one important particular by the contractor. Paragraph 34.02 of the specifications provides in part:
"The mixing machine shall be a mechanical stabilizer of a type that will mix the soil, cement and water in place in one operation to the required depth, and shall be capable of producing a satisfactory product. The machine shall be equipped with approved watering devices so that water can be introduced in the exact proportion required to perform the moist mixing operation."
A mechanical stabilizer is a machine used to pulverize the soil, apply water, and mix the cement, soil and water. The specifications require a "single-pass" stabilizer as distinguished from a "multi-pass" stabilizer. A single-pass machine is equipped with more than one drum and is designed to accomplish the entire operation in one pass over the area being worked. A multi-pass machine contains only one drum and must make more than one pass over the area to complete the operation. In this instance the contractor used a multi-pass stabilizer which it had recently purchased and was using for the first time on this project. Plaintiff's expert witness, LeMieux, was of the opinion the soil cement base failures were primarily due to the use of this machine or at least due to the manner in which the machine was operated. Supporting this conclusion was evidence of many areas where the soil cement base was absent or less than the required thickness and where the soil cement base did not appear to be properly mixed and set up. There is no complaint that the proportions of soil, cement and water called for by the engineers or testing laboratory were deficient in any manner.
Misalignment of curbs and gutters is obviously due to a sinking or subsidence of the base on which the curbs and gutters rest. The logical explanation for the subsidence is improper trenching and backfill for the curb and gutter forms. Although heavy traffic moving over the roll-over curb and gutters and lack of maintenance of off-street drainage may have caused or contributed to some of the curb and gutter problems at certain locations, these factors could not account for the greatest portion of the curb and gutter failures.
The defendant contractor contends the district court failed to give due weight to the testimony of defendants' expert witnesses and defendant particularly attacks the credentials of plaintiff's expert, Baker. In this regard the district court commented:
"Although plaintiff's witness, Mr. Baker, had limited experience with soil cement streets, he had considerable experience with street and roadway construction, and the Court is convinced of his *875 ability to detect by visual inspection and the further probing that he did the street failures. He has had a great deal of experience in all fields of engineering, and attempted in every way to fairly and conscientiously report his findings. His findings were confirmed by Mr. LeMieux, an experienced civil engineer in street construction, whose first inspection of the Winnsboro streets was in 1968."
The trial court's evaluation of the qualifications, credibility and reliability of the expert witnesses is entitled to great weight and we concur with its evaluation in this instance. While the area of inquiry in this case requires professional knowledge and experience, most of the matters testified to by Baker are not of an unusually technical and specialized nature. His general engineering background and experience with street construction, coupled with his extensive investigation into this particular problem, qualified him as an expert and supports the weight given to his testimony by the district court and by this court.
The defendant contractor, supported by amicus curiae brief filed on behalf of The Associated General Contractors of America, Louisiana Branch, urges that the engineering firm and the testing laboratory were agents of the Town and that the Town is bound by their failure to properly supervise and inspect and is, therefore, precluded from recovering from the contractor.
The contract between the Town and the contractor specifically negates this contention. Paragraph 5:03 of the specifications made a part of the contract provides in part:
"Failure of the engineers or authorized representatives during the progress of the work to discover or reject materials or work not in accordance with the plans, specifications and contract documents, shall not be considered an acceptance thereof or a waiver of defects therein; and payment to the contractor or partial or entire occupancy of the Owner shall not be construed to be an acceptance of the work or materials which are not strictly in accordance with the plans, specifications or contract documents."
The fact that an owner has an engineer and testing laboratory on the job does not relieve a contractor of the contractor's duty to perform the work in a workmanlike manner in accordance with the plans and specifications.
The contractor urges it was required to depend on the engineer and testing laboratory by the contract which provides for certain services, supervision, testing and approval to be done by the engineer and the testing laboratory. This may be true in certain respects. For example, if the testing laboratory, with the approval of the engineer, had specified an insufficient proportion of cement to soil resulting in defects, the contractor might not be responsible. However, no contention is made that there was any deficiency in the materials or mixture or other aspects peculiarly within the control of the engineer or testing laboratory and over which the contractor had no control. The defects here resulted from the manner in which the work was done. That the engineering firm and testing laboratory may have also failed in their obligations of inspection and supervision owed to the Town does not relieve the contractor of its obligations to the Town.
(b) Liability of the engineering firm, Barnard & Burk

Paragraph 2(d), (f), and (g) of the contract between the Town and Barnard & Burk provides that the engineer shall perform the following services:
"(d) Supervise the actual construction in the field to protect the Municipality's interest and to assure conformity with Plans and Specifications.

*876 "(f) Supervise all work done by the Material Testing Laboratory, in this Agreement referred to, and check and certify all invoices rendered by said Laboratory.
"(g) Maintain a responsible representative on the job with authority to act as Agent for the Engineers, and maintain engineering personnel as required for the proper prosecution of the work."
Paragraph 4 of the contract entitled "Special Conditions" contains, among others, the following provisions:
"(g) It is understood that the Engineers shall select, subject to the approval of the Municipality; a reputable Testing Laboratory to make field laboratory tests on materials and equipment, thus to insure their conformity with contract requirements. The Testing Laboratory will be employed directly by the Municipality who will also pay the cost of this work.
"(i) The undertaking of inspection by the Engineers in accordance with provisions of Article 2(e) hereof, or otherwise, shall not be construed as supervision of actual construction since the Engineers or their authorized representative will, in no case, act as superintendent or foreman, nor will they interfere with the management of the work. It further shall not be construed to make the Engineers or their authorized representative responsible for providing a safe place or safe conditions for the performance of work under the Contract by: the contractor; the Contractor's employees; Subcontractor; employees of any supplier; or by any person for access, visits, work, travel or occupancy.
"(j) Approval, by the Engineers, of any work done by the Material Testing Laboratory or by Soil Testing Laboratory, shall not relieve said laboratories from the responsibility for errors or faulty work of any kind on their part in connection with material or soil testing or reports covering same, nor shall such approval be construed as making the Engineers responsible for errors of any sort on the part of said laboratory."
The foregoing provisions, together with other provisions of the various contract documents between the parties to this litigation, make it clear that the engineer was to supervise actual construction in the field to assure conformity with plans and specifications, supervise the work done by the testing laboratory and receive reports from the testing laboratory, maintain a responsible resident engineer or resident agent on the job, and maintain such other engineering personnel as required for the proper prosecution of the work. Other provisions of the contract documents make it clear that the engineer's decision as to any questions which might arise concerning the work would be final and that the engineer had the authority to stop work when the work did not conform with the plans and specifications. Other provisions of the contract documents make it clear that the engineer was to select the testing laboratory and direct and supervise its activities, including planning of inspection and testing assignments and receipt and approval of daily reports.
The resident agent or engineer assigned by Barnard & Burk to the Winnsboro job had an educational background of high school, two years of veterinarian medicine and some correspondence courses. He was not a licensed engineer. He had only been employed by Barnard & Burk about six months prior to the Winnsboro project and had acted as a resident engineer on only one other job. When questioned about his routine on the Winnsboro job, the resident engineer stated that he had no set routine and no set procedure to check the various facets of his work each day.
The resident engineer admitted he did not see large areas of the preparation for curbs and gutters on several streets. He accepted incomplete reports from the testing laboratory's employee without questioning *877 the content or lack of content or the extent and location of testing by the laboratory. The resident agent allowed the use of the multi-pass stabilizer in direct violation of the specifications, which he had no authority to do under the contract.
The district court concluded "that this employee did not have the competency for handling this project" and that he obviously relied too much on the Delta and Jenkins employees and gave too little attention to "assure conformity to plans and specifications" and demonstrated "a disregard for procedures provided by the specifications". The district court concluded that this lack of supervision based on lack of engineering background and lack of experience and a disregard of the procedures called for by the contract documents, combined with lack of experience and competency on the part of personnel of Jenkins and Delta, contributed substantially to the poor workmanship and construction which subsequently manifested itself in the defects complained of. The evidence supports these conclusions.
The defendant engineering firm contends it was not required under the contract to supervise actual construction, citing particularly Paragraph 4(i) of the contract. Paragraph 4(i) is seemingly inconsistent with Paragraph 2(d) which specifically obligates the engineer to supervise actual construction in the field. Interpreting the contract as a whole, we view Paragraph 4(i) as dealing primarily with the engineer's status in relation to the contractor for purposes of potential tort or workman's compensation liability or the like, and not as limiting the engineer's responsibility to the owner.
The most forceful contention made by the defendant engineering firm is that an engineer is held only to the same standard of care as applied in the case of architects, physicians, attorneys and others engaged in professions requiring the exercise of technical skills; that the standard to be applied is whether the engineer's performance was in accordance with the skill usually exercised by others of its profession in the same general area; and that the burden of proving such standards and noncompliance therewith is upon the party making the charge. Defendants cite particularly Pittman Construction Co. v. City of New Orleans, 178 So.2d 312 (La.App. 4th Cir. 1965) writ refused 248 La. 434, 179 So.2d 274 (1965); Maloney v. Oak Builders, Inc., 224 So.2d 161 (La.App. 4th Cir. 1969) modified 256 La. 85, 235 So.2d 386 (1970); Day v. National U. S. Radiator Corporation, 241 La. 288, 128 So.2d 660 (1961); Calandro Development, Inc. v. R. M. Butler Contr., Inc., 249 So.2d 254 (La. App. 1st Cir. 1971); Thomas v. Fromherz Engineers, 159 So.2d 612 (La.App. 1st Cir. 1963) writ refused 245 La. 799, 161 So.2d 276 (1964).
The cited cases are good authority for the rule stated above. Each of the cited cases is, however, distinguishable from the instant case in the manner in which the rule was applied under the particular context and factual circumstances of those cases. In Maloney, there was "no explicit contractual duty for `supervision' or `control' of the contractor's work". The evidence in that case related primarily to alleged defects in the plans and specifications prepared by an architect. In Pittman, the dispute centered primarily around the adequacy of plans and specifications prepared by the defendant engineer, where additional costs were incurred by reason of unstable soil conditions unknown to the engineer. Inadequate supervision was not an issue. In Calandro, the contract between the owner and the engineer was verbal although the contract between the owner and the contractor contained general provisions for supervision or inspection by the engineer. The primary issue was what constituted "suitable supervision and inspection" and particularly whether or not this called for a resident engineer on the job in that particular case. Day was a tort suit by the survivors of an employee of a subcontractor *878 killed while working on the project against an architect. Thomas was a suit by an employee of a contractor against the engineer for injuries sustained on the job. Although Day and Thomas both discussed the scope of an architect's or engineer's duty to supervise, the discussion was in the context of delictual duty owed by the architect or engineer to an employee working on the job, which is not necessarily the same as the duty owed by the engineer to an owner under a particular contract.
In the instant case, the engineer's obligations of supervision and the furnishing of a resident engineer on the job are explicitly spelled out. It hardly requires expert testimony to conclude that the engineer's contractual obligations, under any reasonable interpretation of the contracts and the standards established by the contract itself, were not properly carried out. Certainly, the resident agent of Barnard & Burk, on the site and inspecting the work and materials every day, should have required that the single-pass stabilizer called for by the contract be used by the contractor. Certainly, the resident agent should have seen that the testing laboratory made the tests required by the contract. There is expert testimony that the defects in the project were of such magnitude there is no way that a competent resident agent or inspector of the engineering firm could have failed to detect the improper construction procedures. Plaintiff's expert, LeMieux testified:
"A.... But, the improper construction is of such a magnitude and is spread over so much of the job, I don't see how it could not have been spotted by the Engineers, resident inspector or resident engineer while it was going on, in my opinion.
"Q. It's your opinion, therefore, that a resident engineer, properly supervising and inspecting the work done by a Contractor, in accordance with the standards of reasonably competent engineers practicing in the State of Louisiana, would have detected improper construction procedures and seen that they were changed in this particular job.
"A. Yes. This is my opinion."
The contract itself, together with the testimony of LeMieux, viewed within the scope of the proven facts and circumstances of this case, adequately establish the standard of care and duty of the engineer and establishes a breach of that duty, which breach contributed to the substantial defects which are the basis of this suit.
(c) Liability of the Testing Laboratory, Delta.

Paragraph 2 of Delta's contract with the Town provides in pertinent part as follows:
"2. CHARACTER AND EXTENT OF SERVICES:
"The Testing Laboratory shall perform the professional services hereinafter listed:
"A. Earthwork, Subbase, and Soil-Cement Stabilized Base:

"Prior to soil-cement base processing:
"(1.) Prepare soil profile and classification of soils to show suitability of non conformance as specified according to A.A.S.H.O. Class and Plastic Index, with at least one sample taken per block, not to exceed 500 feet apart, and at changes in soil characteristics; the profile to be taken at the grade of the soil-cement base; and to include grain size, liquid limit and plastic index.
"(2.) Prepare in accordance with Article A(1.), above Soils Classification for samples from possible `Borrow Excavation' sites that may be required.
"(3.) Determine optimum moisture content and maximum density relations of samples taken as stated in A(1.) and (2.) above (total and minus #4 material). In accordance with A.A.S.H.O. T 134.

*879 "(4.) Recommend percentage of cement to be used.
"(5.) To inspect and test subgrade prior to soil-cement stabilization.
"(6.) The above tests are to be made in accordance with the recommendations of the Portland Cement Association as set forth in their `Soil-Cement Laboratory Handbook'; with at least three cement percentages tested for each class of soil encounterd with data reported in the form of P.C.A. Laboratory sheet No. 13.
"(7.) During Excavation, Fill and Soil-Cement Processing:

"(a.) The placement of a sufficient number of qualified personnel on the site of operations at all times to insure adequate inspection.
"(b.) Check the cement spread for proper percent and distribution, depth of treatment, pulverization of material, moisture content and control.
"(c.) Conduct sufficient number of field density tests to assure that specified minimum compaction requirements are obtained.
"(d.) Provide ample inspection to insure proper curing of the stabilized base.
"(e.) The rendering of daily reports reflecting complete details of operation and location of activities. Reports shall also include theoretical quantities of cement required and amount actually placed on each street along with quantity of roadway processed in square yards.
In addition, the Laboratory will provide the Engineer with a penciled report at the end of each day comparing barrels of cement processed with the theoretical requirements.
"(f.) All tests and inspections shall be in accordance with the latest specifications and recommendations of the Portland Cement Association's Soil Cement Laboratory Handbook."
Paragraph 3 of the contract provides:
"3. COMBINATION CONCRETE CURBS AND GUTTERS:
"A. The Testing Laboratory shall design the concrete mix and check, during construction of combination concrete curbs and gutters, compaction of base, dimensions of the section, molding, curing and testing of sufficient concrete cylinders to assure conformance with the plans and specifications. Reports covering the above shall include complete details of operation and location of activities. Reports shall include results of 7 day and 28 day compressive tests."
The man assigned by Delta to the job had a high school education and no previous experience in construction or testing work prior to his employment by Delta. He started to work for Delta about five months before the Winnsboro job. He had no previous experience whatsoever in soil cement testing prior to the Winnsboro job.
The daily reports submitted by Delta's inspector to the engineer are incomplete in that they do not show the location of the tests or the number of tests made. The reports show every test made as revealing exactly eight inches of soil cementno more, no less. Delta's own expert witness, Higgins, testified the Louisiana Department of Highways would not have placed an inspector with only six months experience in charge of a job the size of the Winnsboro job unless the inspector was properly supervised by a qualified resident engineer.
It was conceded by Delta that none of the tests and work required by Paragraph 2A. (1) thru (6) were performed with the exception of the determination of the moisture content, Delta's reason for nonperformance of these services being that they were not actually employed until a late date after work had already begun and *880 when there was not sufficient time to do these tests. It is conceded by Delta that Paragraph 3A. of the contract was not complied with and its inspector testified he did not even know of that provision in the contract and made no inspection or test of compaction of the base during construction of the concrete curbs and gutters.
We conclude, as did the district court, that Delta breached its contract with the Town in failing to provide adequate and experienced personnel and in failing to make sufficient tests both in relation to the soil cement operations and in connection with the construction of curbs and gutters. These failures on the part of Delta had a direct contributing causal relationship to the failures and defects which subsequently manifested themselves in the project.
Delta's primary contention is that any failure on its part to comply with the contractual provisions did not cause the damage suffered by the Town, that is, did not cause the particular defects complained of. It is true that Delta's breach of its contract was not causally related to a number of the defects itemized on Baker's list. However, as is evident from the foregoing discussion, Delta's failure to meet its obligations under the contract was a principal contributing cause of the two main categories of defects, that is, failures of the soil cement base and subsidence of the concrete curbs and gutters. For the reasons explained in the section of this opinion dealing with the amount of damages it is unnecessary to detail the particular items for which Delta might not be responsible. Delta's breach of its contract was a contributing cause of defects, the cost of repairing which would be at least the amount awarded to the Town.
Amount of Damages
The district court awarded damages in the amount of $175,000 for costs of repairs and $270,000 for loss of value or a total of $445,000. It is the conclusion of this court that the award of $175,000 for cost of repairs is entirely correct but that the district court was in error in making an additional award for loss of value.
Plaintiff's petition, as amended and supplemented, alleges that certain defects and deficiencies presently exist and will continue to appear necessitating repairs expected to cost $175,000. The petition alleges plaintiff has also sustained additional damages totaling the sum of $300,000, said damages resulting from the loss of value of the street system over and above normal depreciation, wear and tear. The petition prays for judgment in the full sum of $475,000.
During trial of the case, plaintiff offered evidence to show the cost of repairs as being an amount substantially in excess of $175,000. Defendants objected to the evidence as enlarging the pleadings. Plaintiff then orally moved to amend its petition to conform to the evidence in accordance with LSA-C.C.P. Art. 1154. Plaintiff's motion was denied by the district court with the court commenting it would not be fair to the defendants at that stage of the game to make any kind of amendment. Nevertheless, plaintiff's evidence as to the cost of repairs was admitted subject to defendants' objection and is in the record. In its written reasons for judgment, the court commented further on this issue as follows:
"In the Court's opinion plaintiff is bound by this itemization of damages, although it appears from the evidence that the costs of repair are considerably in excess of $175,000.00. Itemization of damages is not eliminated entirely under the Louisiana Code of Civil Procedure, and the Court is of the opinion that defendants are entitled to know the particular damage to which they will have to answer. When plaintiff claims $175,000.00 for repairs, defendants could not be expected at the trial to have to meet a repair bill considerably in excess of that."
*881 LSA-C.C.P. Art. 1154 provides:
"When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised by the pleading. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure to so amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby, and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense on the merits. The court may grant a continuance to enable the objecting party to meet such evidence."
Under Article 1154, the district court in an instance such as this is given discretion to allow pleadings to be amended and is mandated to do so freely when the presentation of the merits of the action will be subserved thereby and if the admission of the evidence would not prejudice the objecting party in his defense on the merits. The court is given discretion to grant a continuance to enable the objecting party to meet the evidence.
This suit was filed June 17, 1969, and trial on the merits commenced on August 24, 1971, more than two years later. From the time of filing suit to the date of trial, the parties employed numerous discovery devices, filed various exceptions and plaintiff filed three supplemental and amending petitions, the last being filed in July before the trial in August. At this late date plaintiff was still only alleging $175,000 as costs of repairs. In view of the complexity of the case, the numerous parties, attorneys and expert witnesses who were brought together for the trial, the opportunity of amendment of the petition before the case came to trial and the difficulty a continuance in the middle of the trial would have created, we conclude the district court did not abuse its discretion in denying the amendment to the petition. Having denied the amendment, the court was correct in limiting recovery for cost of repair to the amount alleged for this item of damages, that is, $175,000.
The evidence clearly supports the award to plaintiff of $175,000 for the cost of repairing defects in the street system attributable to improper construction. Plaintiff's witness, Poulos, an experienced contractor, using current prices on a unit basis estimated a total cost of $319,069.62 for repairing all of the defects itemized on the list prepared by Baker. Defendants' witness, E. A. Caldwell, Jr., a licensed civil engineer and an experienced estimator for a highway construction firm, estimated the cost of repairing all of the defects on Baker's list at approximately $200,000. Caldwell testified he would contract to do the work for that amount. The district court commented it was impressed by the witness, Poulos, and could not accept the estimate of Caldwell primarily on the basis of lack of thorough study and investigation by Caldwell. The district court commented that it appeared from the evidence the costs of repair are considerably in excess of $175,000.
This court concludes from all of the evidence that the costs of repairing all of the defects actually existing and actually due to improper construction equals, but would not substantially exceed the sum of $175,000. There are two basic reasons for this conclusion.
First, we have meticulously and laboriously, with the aid of the excellent and well-organized briefs of all parties, reviewed the evidence relative to each defect itemized on Baker's list. The evidence supports the existence of many of the defects *882 that repairs are called for and that the defects resulted from improper construction. However, as to numerous items contained on Baker's list the evidence preponderates that the defects are relatively minor, do not call for repairs to the extent shown on Baker's list and have not been proven to be due to improper construction. Plaintiff is not entitled to recover for all the alleged defects on Baker's list.
Secondly, our view is that the record does not reflect any reason why there should be any particular difference in the weight given to the testimony of Poulos and Caldwell as to the cost of repairs. Both are experienced contractors and both had sufficient information with which to calculate their estimates. There is nothing unusual about two contractors arriving at substantially different prices in estimating or bidding on a job.
This court has not attempted to itemize each so-called defect on Baker's list for which recovery should be allowed nor has this court attempted to apply an exact dollar amount to the cost of repairing each such defect. Our study has, however, been detailed enough so that our considered overview of both the number and extent of defects and the estimated cost of repairs leads us to the conclusion that the cost of repairs for which recovery should be allowed equals but does not substantially exceed the amount awarded, that is, $175,000. Although not calculated with mathematical precision and certainty, but with as much certainty as can be derived from the evidence, our conclusion is that $175,000 fairly compensates plaintiff for the cost of repairing defects proven to exist at the time of trial and proven to have resulted from improper construction.
Turning to the issue of recovery for loss of value beyond normal depreciation, wear and tear, it is this court's conclusion that plaintiff is not entitled to recover damages for this item in addition to damages for the actual cost of repairs.
First, it is recognized that there are two approaches to the calculation of damages due from improper construction. In most instances the proper measure of damages is the actual cost of repairs. In other instances, for example where the defects cannot be repaired, the measure of damages might be the loss of value of the structure attributable to the defects. See 13 Am.Jur.2d; Building and Construction Contracts, Sec. 79. We find no authority, however, for awarding both the cost of repairing defects and loss of value due to the same defects. Such an award would amount to a double recovery for the same items of damage.
The case of Guillot v. Moore, 131 So.2d 533 (La.App.2d Cir. 1961), cited by plaintiff is not authority for such a double recovery. That case involved the improper construction of a residence. The owner was awarded a certain amount as the cost of repairing certain defects which were repairable. An award was also made to the owner based on loss of value for an entirely separate defect in the foundation which could not be repaired. The instant case is distinguishable from Guillot because in the instant case the award for loss of value is attributable to the exact same defects for which the cost of repair has been awarded.
The instant case might be an appropriate case in which to use loss of value as the basis for the entire award, in that repair of the manifested defects will not remedy the basic problems and the evidence is that further defects will continue to appear. However, we find the evidence in this record to be insufficient and too speculative to serve as a basis on which to calculate an award for loss of value.
The $270,000 award for loss of value made by the district court is based on a calculation projected by the plaintiff's witness, LeMieux. LeMieux's computation was based on the premise that a soil cement base should last at least thirty years. The evidence does not substantiate this basic *883 premise. LeMieux did not explain his reasons for arriving at an expected life of thirty years. Several of defendants' witnesses testified that it is impossible to assign a life expectancy to a particular soil cement street project because of the many variables that go into determining how long such a street will last.
LeMieux made his computation by assuming a life expectancy of thirty years, an original construction cost or value of $500,000 and a normal residual value of $100,000 at the end of the thirty-year period. He then calculated what would be a normal depreciation on a straight line basis for each of the first ten years from the date of construction. LeMieux then calculated what he called actual yearly depreciation based on his estimates of the actual cost of repairing the defects which manifested themselves each year. He determined that the streets are depreciating at such a rate that they will reach maximum depreciation ($100,000 residual value) in ten years. He projected that the normal depreciation at the end of ten years would be $130,000 and that the depreciation on these streets at the end of ten years would be $400,000 and, thus, arrived at a loss of value equal to the difference, that is, $270,000.
While it is certainly true that defects have continued to manifest themselves, the rate of continued manifestations in the future is highly speculative and conjectural. Equating actual depreciation to actual cost of repairs on a yearly basis is not necessarily consistent. We find both the formula employed by LeMieux and the basic factual premises on which his calculations were made to be too speculative on which to base an award for loss of value.
Another contention made by defendants relating to damages is that plaintiff is not entitled to recover for defects in streets not specifically listed by name in plaintiff's petition. Plaintiff's petition lists a number of streets which are claimed to have defects and plaintiff offered evidence at the trial of defects in some streets not listed in the petition. It is clear from the allegations of the petition that the claim is for damages for defects throughout the entire street system and the list of streets contained in the petition is merely illustrative. The evidence pertaining to defects in streets not listed was properly received and considered.
Defendants, Jenkins and Travelers, further contend that plaintiff's claim in regard to defects in some streets is barred by the three-year prescription provided in LSA-R.S. 38:2189. Plaintiff's original petition, filed within the three year period, listed certain streets. After the three year period an amended petition was filed listing additional streets. Defendants contend plaintiff's claim for defects in the streets listed in the amended petition has prescribed.
Defendants' position is without merit. Plaintiff asserted one cause of action for damages arising out of defects in the entire street system based on breach of a contract covering the entire system and the listing of streets was merely illustrative. Furthermore, the action asserted in the amended petition arose out of the conduct, transaction and occurrence set forth in the original petition and, therefore, the amendment relates back to the date of filing the original petition under the express provisions of LSA-C.C.P. Art. 1153. The Town's original petition set forth a cause of action for breach of contract and the matter set forth in the amending petition arose out of and related to the same breach of contract by the contractor. Therefore, the amendment by plaintiff listing additional defects related back to the date of filing the original petition which was within the three-year prescriptive period.
Solidary Liability
Defendants, Barnard & Burk and Delta, contend the district court was in error in casting all defendants in solido. *884 Defendants argue that they cannot be liable in solido because each of them entered into a separate and distinct contract with the Town with separate and distinct duties and obligations and none of the contracts expressly provided for liability in solido.
The district court reasoned that the defendants were all obligated differently from the other for one and the same thing, namely, supervision and performance in accordance with the plans and specifications, and that the damages sustained by plaintiff resulted from a failure to comply with such obligation attributable to all defendants. The court held the defendants liable in solido under LSA-C.C. Art. 2092.
We affirm the district court's conclusion that the defendants are liable in solido, although the basis for our decision varies somewhat from that of the district court.
Pertinent to this issue are the following articles of the Louisiana Civil Code:
"Art. 2078. Several obligations are produced, when what is promised by one of the obligors, is not promised by the other, but each one promises separately for himself to do a distinct act; such obligations, although they may be contained in the same contract, are considered as much individual and distinct as if they had been in different contracts, and made at different times."
"Art. 2080. When several persons join in the same contract to do the same thing, it produces a joint obligation on the part of the obligors."
"Art. 2082. When several persons obligate themselves to the obligee by the terms in solido, or use any other expressions, which clearly show that they intend that each one shall be separately bound to perform the whole of the obligation, it is called an obligation in solido on the part of the obligors[.]"
"Art. 2084. Several obligations, although created by one act, have no other effects than the same obligations would have had, if made by separate contracts; therefore they are governed by the rules which apply to all contracts in general."
"Art. 2086. In a suit on a joint obligation, judgment must be rendered against each defendant separately, for his proportion of the debt or damages, if the suit resolves itself into damages. If the suit be for a specific performance, each defendant may be compelled to execute his proportion of the obligation, if the nature of the case permit and justice require it. The proportion, meant by this and the succeeding articles, is calculated by the number of the obligors, each one answering for an equal part, unless the parties have expressed a different intention."
"Art. 2091. There is an obligation in solido on the part of the debtors, when they are all obliged to the same thing, so that each may be compelled for the whole, and when the payment which is made by one of them, exonerates the others toward the creditor."
"Art. 2092. The obligation may be in solido, although one of the debtors be obliged differently from the other to the payment of one and the same thing; for instance, if the one be but conditionally bound, whilst the engagement of the other is pure and simple, or if the one is allowed a term which is not granted to the other."
"Art. 2093. An obligation in solido is not presumed; it must be expressly stipulated.
"This rule ceases to prevail only in cases where an obligation in solido takes place of right by virtue of some provisions of the law."
Defendants cannot be joint obligors since a joint obligation is created when several persons join in the same contract to do the same thing. LSA-C.C. Art. 2080. Here the defendants did not join in the same contract to do the same thing.
*885 Argument is made that the obligations of the defendants are several. Several obligations arise when what is promised by one of the obligors is not promised by the other but each one promises separately for himself to do a distinct act. LSA-C.C. Art. 2078. When the defendants in this case separately contracted with the Town to do separate and distinct acts (construction by the contractor, supervision by the engineer, and testing by the testing laboratory) several obligations as defined by LSA-C.C. Art. 2078 were produced. Each defendant was obligated to do only what he promised to do. In the performance of their separate contracts, there was certainly no solidary obligation on the part of the defendants as they each contracted to do separate and distinct things.
It does not necessarily follow, however, that the obligations now owed by the defendants remain several. The obligation which plaintiff seeks to enforce is not to construct or to supervise or to test, but is the obligation of each defendant to respond in damages arising out of a breach of their separate contracts. The defendants' respective breaches of their contracts combined and contributed to cause the same item of damages sustained by the plaintiff. At this point, the defendants are all obliged to the same thing, each may be compelled for the whole, and payment by one would exonerate the other toward the creditor. The defendants are obliged differently from each other, by reason of breach of their separate contracts, to the payment of one and the same thing, that is, the cost of repairing the defects in the street system. Thus, all of the elements of an obligation in solido as defined by LSA-C.C. Arts. 2091 and 2092 are met.
Defendants opposing solidary liability rely principally upon LSA-C.C. Art. 2093 which provides that an obligation in solido is not presumed and must be expressly stipulated unless the obligation in solido takes place of right by virtue of some provisions of law. Defendants argue quite correctly that an obligation in solido was not expressly stipulated in any of the defendants' contracts. In order for there to be an obligation in solido in this case, it must arise by virtue of some provision of law, and defendant urges that there is no express provision of law providing for solidary liability in this instance.
Under LSA-C.C. Arts. 1930 et seq., relating to damages for breach of contract generally, and under LSA-C.C. Art. 2762, relating to damages arising out of a construction contract specifically, each of the defendants is bound for the whole of the obligation, that is, to repair the damages and bear the loss caused by them. Under these circumstances, the obligation is solidary by operation of the law or provision of the law in that it meets the definition of an obligation in solido as defined by Art. 2091.
It is worthy of note that Article 1792 of the Code Napoleon, which is the source provision for our Article 2762, has been interpreted as establishing solidary liability between the architect and other workmen responsible for a building erected by the job. See Planiol, Civil Law Treatise, Volume 2, Sections 738 and 1911 (LSLI Translation 1959). We are aware that the French article reads "the architect and undertaker shall bear the loss" whereas Article 2762 reads "the architect or undertaker shall bear the loss" but we do not regard this difference as having any significance in the meaning of the two articles.
Although an obligation in solido is not to be presumed, we do not regard it necessary that the provisions of law under which several persons become obligated to the same thing and may be compelled for the whole, expressly use the words "in solido" so long as the scope and effect of the obligation meets the criteria of Article 2091. This view may seem contrary to the rationale of the court in Wooten v. Wimberly, 272 So.2d 303 (La. 1972). The Wooten case involved the issue of whether a father is obligated in solido with his minor child for a tort committed by the minor for purposes *886 of determining whether a suit filed against the father interrupted prescription running against the minor child. The court held that although both were liable for the whole, they were not liable in soldio and a suit against one did not interrupt prescription as to the other. However, the Woolen case, in which three judges disagreed on the question of solidary liability, is so entirely different in the context in which solidary liability was considered that we do not regard that decision as controlling in the instant case.
It matters not that the obligation of the defendants to repair the damages and bear the loss arose from separate breaches of separate contracts to do separate things. The jurisprudence recognizes that solidary obligations may result even though the parties are bound under separate contracts and even though one party may be bound under contract and the other through some other basis of law. In Bonacorso v. Turnley, 98 So.2d 295 (La.App. 1st Cir. 1957), both the owner-lessor and purchaser-lessee were held solidarily liable for a real estate agent's commission where each in separate contracts obligated themselves to pay the commission.
In Gay & Co. v. Blanchard, 32 La.Ann. 497 (1880), a mortgagor and a party who assumed the mortgage were held liable in solido to the mortgagee.
In Finn v. Employers' Liability Assurance Corporation, 141 So.2d 852 (La.App. 2d Cir. 1962), an assured bound in tort and an insurer bound in contract were held liable in solido.
In Granger v. General Motors Corporation, 171 So.2d 720 (La.App. 3d Cir. 1965), it was held that there was an obligation in solido on the part of a truckdriver who was liable in tort and a manufacturer and seller of the truck for breach of warranty.
In Cline v. Crescent City R. Co., 41 La. Ann. 1031, 6 So. 851 (1889), the City of New Orleans and a railroad company were held liable in solido to a plaintiff where the city's obligation to maintain the streets was by imposition of law and the railroad's obligation to maintain the streets was by virtue of a contract between it and the city.
The plaintiff urges the applicability of LSA-C.C. Art. 2324 as a basis for imposing liability in solido. Article 2324 provides:
"He who causes another person to do an unlawful act, or assists or encourages in the commission of it, is answerable, in solido, with that person, for the damage caused by such act."
Defendants urge the article is not applicable because it appears in that part of the Civil Code dealing with offenses and quasi offenses and has no applicability to obligations arising out of a contract. There is authority for defendants' position. See Hartman v. Greene, 193 La. 234, 190 So. 390 (1939).
Under Article 2324, tort feasors, whose wrongful or negligent acts combine or contribute to the causing of damage, are held liable in solido. Even if Article 2324 is not directly applicable in this case involving damages for breach of contract, the underlying principle is the same and the principle is perhaps applicable by analogy. "Unlawful act" as used in Article 2324 has been defined as a "wrongful" act. Hartman v. Greene, supra. A breach of contract is a wrongful act and, in fact, it is often difficult to determine in a suit for damages between parties who had a contractual relationship with each other whether the cause of action is founded in contract or in tort. Although the article appears in the chapter on offenses and quasi offenses, we see no reason why the principle embodied in the article should not be applied where the wrongful acts (breach of contract) of more than one person combine to cause damage to another.
Attorney's Fees
The district court granted judgment in favor of plaintiff against Jenkins and its *887 surety, Travelers, for $60,000 attorney's fees. Finding that the bond and the contract specifications specifically provided for the payment by the surety of the owner's reasonable attorney's fees, the district court made the award on the basis of Maloney v. Oak Builders, Inc., 256 La. 85, 235 So.2d 386 (1970), commenting that to disregared the provision regarding reasonable attorney's fees would deny to the parties the right to contract upon their own terms.
Jenkins and Travelers contend that the district court erred in awarding attorney's fees because the bond does not contractually provide for attorney's fees and because the statute requiring a bond in connection with a public contract does not provide for attorney's fees.
Paragraph 3.04 of the specifications made a part of the contract between the Town and Jenkins provides in part:
"The bond shall also secure for the Owner the faithful performance of the Contract in strict accordance with the Plans and Specifications. It shall protect the Owner against all liens or claims which may be filed against the work, and shall provide for payment of reasonable attorney's fees for enforcement of the Contract and institution of legal proceedings if such proceedings become necessary."
The first paragraph of the second page of the bond executed by Jenkins as contractor and Travelers as surety provides:
"PROVIDED FURTHER, that said Surety takes full cognizance of the provisions of Article 3.04, 8.10 and 8.11 of the Specifications and Contract Documents, as a part of the attached contract, and shall pay to or for the account of the Owner reasonable attorneys' fees for endorsement of the contract and/or the institution of legal proceedings, if such proceedings become necessary; ..."
The bond expressly obligated the surety to pay to or for the account of the owner reasonable attorney's fees for enforcement of the contract and/or the institution of legal proceedings if such proceedings become necessary.
The statute requiring a bond in connection with the construction of public works, LSA-R.S. 38:2241, provides:
"Whenever the state or any state board or agency or any political subdivision of the state enters into a contract in excess of one thousand dollars for the construction, alteration, or repair of any public works, the official representative of the governing authority shall reduce the contract to writing and have it signed by the parties. He shall require of the contractor a bond, with good, solvent, and sufficient surety in a sum not less than fifty percent of the contract price for the faithful performance of the contract with an additional obligation for the payment by the contractor or subcontractor for all work done, labor performed, or material or supplies furnished for the construction, alteration, or repair of any public works, or for furnishing materials or supplies for use in machines used in the construction, alteration, or repair of any public works. No modifications, omissions, additions in or to the terms of the contract, in the plans or specifications or in the manner and mode of payment shall in any manner affect the obligation of the surety. The bond shall be executed by the contractor with surety or sureties approved by the officials representing the state, state board or agency, or political subdivision and shall be recorded with the contract in the office of the recorder of mortgages in the parish where the work is to be done not later than thirty days after the work has begun."
No authority is cited in support of defendants' opposition to the award of attorney's fees. The scope and purpose of the statute requiring a bond is to protect the public authority from loss and expense arising out of the failure of the contractor to faithfully perform the contract. Attorney's *888 fees incurred in a suit to enforce the obligations of the contract are a direct expense incurred by the owner due to failure of the contractor to properly perform. Where such attorney's fees are contractually provided for as in this case, they are recoverable from the contractor and its surety.
Attorney's fees, as an expense to the public authority arising out of improper performance of the contract, are within the scope of the statute. Thus, this case is distinguishable from the line of cases holding that engagements of the surety enlarging the coverage required by the statute must be read out of the bond. Compare Miller v. Bonner, 163 La. 332, 111 So. 776 (1927); Long Bell Lumber Co. v. S. D. Carr Const. Co., 172 La. 182, 133 So. 438 (1931); Patent Scaffolding Co. v. Ross Corporation, 172 So.2d 364 (La.App. 4th Cir. 1965) writ refused 247 La. 870, 175 So.2d 108 (1965); and Pittman Const. Co. v. Housing Auth. of New Orleans, 169 So. 2d 122 (La.App. 4th Cir. 1964) writ refused 247 La. 343, 344, 346, 347, 348, 170 So.2d 865, 866 (1965). The statement in Pittman contrary to our holding is purely dictum, the court in that case having determined attorney's fees were not due because the contractor complied with its obligations under the contract.
No complaint is made as to the amount awarded by the district court. We affirm the award for attorney's fees.
Third Party Demands
Jenkins and Barnard & Burk urge that the district court was in error in not granting them judgment on their third party demands against Delta. All three parties having been guilty of breaches of their respective contracts contributing to the damages suffered by plaintiff, none of them is entitled to judgment over against the other.
Decree
For the reasons assigned, the judgment of the district court is amended to reduce the amount of the principal award to the sum of $175,000, and as amended is affirmed. The costs of appeal are assessed to the defendants.
Amended, and as amended, affirmed.