YARRUT, Judge.
Plaintiff appeals from a judgment of the District Court denying it recovery of $59,-725.25, interest and costs, for extra work alleged to have been caused by inadequate plans and specifications furnished by Defendant, for whom Plaintiff contracted to do the work. Plaintiff will be referred to herein as “Contractor”, and Defendant as “Levee Board”.
The contract was for the construction of a Marina on the lake front in the City of New Orleans, which involved the driving of 1800 underwater piles, 611 of which were driven beyond the 3-inch tolerance allowed by the contract and had to be “jetted” so that they could be realigned. The Contractor claims $97.75 for each of the 611 piles jetted for this purpose. “Jetting” of piling is described as the using of a hose pipe with water under force to drive the sand away from the piling. When this operation is done concurrently with the driving of the piling to penetrate the sand strata, it is called pre-jetting. When it is done to loosen the sand in order to realign the piling, this is called post-jetting.
*193 The Levee Board contends the “jetting” was due to the incompetency and negligence of the Contractor’s piling subcontractor; that the pre-soil borings of experts was sufficient to forewarn the Contractor of the subsoil conditions, none of which were unknown, and that no written approval for the correction or “jetting” of the 611 piles, or agreement to pay extra therefor, was given by the Levee Board.
There were three bidders for the contract. Plaintiff-Contractor was $56,000.00 lower than the second, and $182,388.00 lower than the third bidder.
The ultimate decision here must rest upon the terms of the contract and the applicable statutes and jurisprudence.
In its letter to the Levee Board accompanying its bid, Contractor stipulated that, having carefully examined the original and Supplemental General Conditions of the contract; the specifications (sections 1 through 29) and drawings (1 through 34), dated July 24, 1961, titled “Marina for Orleans Levee Board” prepared by Favrot and Grimball, Architects; and having visited the site and informed itself of all conditions affecting the work, it proposed to furnish all labor and materials called for in strict conformity therewith for the prices set out in detail in its bid.
With regard to the Change Orders, Contractor agreed that, if awarded the contract, and should extra work or credits for omissions be authorized, in writing only, by the Levee Board, the amount to be charged or credited therefor would be the same as the basic labor and material of the subcontractor’s proposal, or the actual cost to the Contractor, with applicable insurance, taxes, social security payments and bond, plus 15% for General Contractor’s profit and overhead.
The detailed specifications provide (Article 15) that:
“Should conditions encountered below the surface of the ground be at variance with the conditions indicated by the drawings and specifications the contract sum shall be equitably adjusted upon claim by either party made within a reasonable time after the first observance of the conditions.”
The subsoil conditions were set forth in a report made part of the contract by the Eustis Soil Boring Corporation. There is no evidence that they were at variance with those conditions actually encountered on the job.
The Piling Specifications provide:
“10. Jetting: No jetting is anticipated to obtain the desired penetration; however, in the event that it becomes essential, the contractor shall notify the Architect accordingly in writing and a change order for such work will be negotiated as indicated.”
“Any piling driven beyond a three inch tolerance shall be sufficient cause for driving additional pilings, all cost of which shall be borne by the contractor.” (Piling Specifications Exhibit “4”)
Two facts are undisputed: (1) The Contractor did not jet the 611 pilings in question while he was driving them in order to penetrate the sand strata; rather, he post-jetted them so that he could realign them within the three-inch tolerance allowed; (2) no written change order to post-jet the pilings was ever obtained by the Contractor from the Levee Board.
Plaintiff relies on the following provision in the bid proposal (page 6) : *194 Plaintiff argues that it can recover under this provision because it refers to the post-jetting, which it did, not the pre-jetting, which it didn’t do. He maintains that he did jet the piling and did wash the sand away from the piling in order to realign the piling and in doing so penetrated the sand strata. However, it would seem that the words “jetting of piling through sand strata” means driving piling through the sand strata and refers to pre-jetting, an interpretation in which George P. Rice, Plaintiff’s expert witness concurred.
*193 “In the event jetting of piling through sand strata is required as directed by the architect:
“Per piling driven on land:
“Add: Eighty-one dollars and fifty cents ($81.50)
“Per piling driven over water:
“Add: Ninety-seven dollars and seventy-five cents ($97.75)”
*194 Arnold Wolfe, a plaintiff witness, admitted he never encountered a sand strata that he had to pre-jet through; that he was exclusive and sole subcontractor for the pile-driving work, although the contract was taken in his brother’s name; most of the “jetting” was done after the pilings were driven to straighten them out, all by post-jetting; and that he did not know if the change order was secured after the pilings were driven and before post-jetting; that ten piles jetted were not covered by the Levee Board contract; that he made a mistake as pre-jetting was not required in the contract specifications, only in his own subcontract with Pittman; that he never read the subsoil investigation report of Eustis Engineering Company before starting the work, nor did he review the soil boring data available, even though soil boring is set forth in the Plans and Specifications; that his neglect was because the subcontract with Contractor was in his brother’s name and confected by his brother with the Contractor; that, normally, he examines soil borings before taking jobs, but had not done so in this case.
Gerald Gallinghouse, President of the Levee Board, testified there was no disagreement about the piling job being out of alignment, nor any disagreement that the Levee Board would not accept the pilings as driven; nor was there any question or suggestion that it was necessary to “jet” the piling in order to get through the sand strata. The only question was the Contractor’s problem of improperly aligned pilings and the refusal of the Levee Board to substitute their judgment for the judgment of the Contractor, or instruct him in the proper performance of his work; that there was never any suggestion by the Contractor that it encountered any unforeseen difficulties, or latent subsurface difficulties; that the simple fact was that the pilings were not in alignment, and the Levee Board could have required that they be pulled and redriven correctly; that he requested a cost estimate on “jetting” simply because the Levee Board had the right to know the facts, and since the Contractor threatened to claim extra money under the Unit Price Clause; that neither he nor the Levee Board intended to pay for the “jetting” when he asked for pertinent information, as payment for “jetting” was only to be made when “jetting” was necessary to get through impenetrable sand strata.
George P. Rice, Civil Engineer, testified for Contractor that he examined the Eustis report on subsoil investigation of the Marina for the Contractor; that, with the Eustis report available, it would be impossible to expect all piles driven to be in proper alignment; that to drive a seventy-seven (77') foot piling through twenty-three feet of mud and then two to five feet of sand, would cause some breakage and a side displacement.
When asked by plaintiff’s counsel if the Contractor, with the information at hand, could anticipate how many piles would be misaligned and, if not, how would he be able to properly bid, Mr. Rice answered: “Again, I think that’s a matter of judgment of the contractor.”
Mr. Rice then assigned several reasons why piles may shift, such as improper cutting of tip, natural crookedness of pile, breakage of pile, etc., and that he never fully examined the plans, specifications and bids; only Eustis’ Subsoil Report
Mr. Rice, under questioning by the Court, admitted that, once he saw the Eustis Sub *195 soil Report, he would have been forewarned that there would he difficulty in driving straight piling, and that most good contractors would have “flagged” this condition.
Upon being shown the contract provision setting forth, “no jetting is anticipated to obtain the desired penetration” and being asked by the Court if the language did not refer strictly to penetration, Mr. Rice replied in the affirmative, and that the clause did not deal with “jetting” to bring a piling already driven into alignment. He also agreed that language in the Unit Price provision of the bid proposal referred to pre-j etting.
Further, with reference to the Contractor’s poor equipment and workmanship, Mr. Rice admitted he had never studied any reports relative to the poor equipment or poor workmanship of the Contractor.
Albert E. Pittman, Secretary-Treasurer of Contractor, testified he personally supervised the j ob; reviewed the plans and specifications prior to bidding on the contract, and awarded the subcontract for piling to the Wolfe Brothers; that, before the contract was signed, he anticipated trouble with the alignment of the pilings to be driven under twelve (12') feet of water; and, after about twenty pilings were driven, the subcontractor fired his pile-driving crew and hired a new crew and an experienced foreman.
Under questioning by the Court, Mr. Pittman was unable to tell of any soil conditions that differed or varied from the soil conditions shown in the Eustis borings; and admitted that the architects and engineers had pointed out that his pile-driving leads were improperly fixed; that the pile-driving barge was leaking, and that their crewmen did not know their job. Finally, Mr. Pittman admitted there was no formal change order issued to the contract; and that, since the job involved the driving of piles in water, that his base bid had been increased to cover an allowance for realigning piles, but not to include an allowance for “jetting” the piles.
Mr. LeGardeur, Civil Engineer and consulting engineer, testified as to his experience on pile foundation jobs, both on land and under water, and his recognition as an expert; and that no sand strata was encountered in the pile-driving work not contemplated or shown by the plans and specifications; that he ordered the Contractor to “jet” only five piles and countermanded the order after only two were pre-jetted; that the balance of the piles were post-jetted, but not at the direction of the Levee Board Engineers, but solely at the direction of the Contractor, that all piles post-jetted were jetted at Contractor’s request only to straighten them out.
Mr. LeGardeur further testified that the jetting was not necessary to penetrate the upper sand strata; that jetting loosens soil around and destroys the functional value of the pile. He pointed to many instances of poor workmanship, and showed that, prior to the work, the area had- been dredged to a depth of fourteen (14') feet, which resulted in removing most of the stumps that would not have been anticipated.
Finally, Mr. LeGardeur testified that he gave all contractors who bid, (including Pittman) the conditions, the log of the Eustis borings, the subsurface conditions and the specifications after which it was up to them to make their bid for such a sum to guarantee the work would meet specifications; that there were no subsurface conditions that were not anticipated.
James R. Gore, a graduate engineer, connected with the Eustis Company, who made the soil borings, testified there were no sand strata conditions that were not anticipated.
Victor Carl Hicks, a graduate engineer with the Williams-McWilliams Industries and Vice-President of that company, which bid on the same contract, testified that his company included in the total bid an item *196 for positioning- piles, if they were not in position after being driven; that there was nothing ambiguous about the plans and specifications; and that they had included in the base bid $5.00 per pile to straighten on the whole 1800 piles; that his company had estimated they would have to correct something like 1,280 pilings or less, at an actual cost of $5.00 per piling or about $6,000.00.
John David Blanton, a representative of another unsuccessful bidder, H. P. Fowler and Company, Inc., testified his company also included in their base bid a sum to cover possible realignment of the pilings, a recognized practice on this kind of job; that the amount added was about $17,000.00.
Jean M. Cornelius, Levee Board Inspector, and a graduate engineer, testified that the reasons for poor alignment of the piles were poor equipment and lack of coordination between the engineering crew and the driving crew; a leaky barge that was very unsteady; the use of improper leads in the beginning through a point where half of the piles were already driven; that one row of the piles through Contractor’s error alone, were driven two (2') feet off its proper location, when the contracted tolerance was three inches (3").
Armand L. Willoz, Chief Engineer of the Levee Board, testified that jetting is detrimental to soil conditions holding the pile; that the total cost of post-jetting the piles was $16,175.20; that the water area had been excavated to a depth of at least twelve (12') feet, in all probability eliminating stumps which the Plaintiff indicated may have been the source of his difficulties; that there were no unusual subsurface sand strata conditions; and that the Levee Board never agreed to pay any cost of realignment and a change order had been refused.
Henry G. Grimball, Architect for the Levee Board, pointed out that the pile specifications clearly set forth a three-inch tolerance, and that the failure to conform to these tolerances shall be sufficient cause for driving additional piles "all costs of which shall be borne by the contractor.”
Contractor here relies heavily on LSA-R. S. 9:2771 to prove the non-applicability of O’Leary v. Board of Port Commissioners for Port of New Orleans, 150 La. 649, 91 So. 139; and Brasher v. City of Alexandria, 215 La. 887, 41 So.2d 819, to the case at bar. The O’Leary case stands for the principle that, in an action for extraordinary expense incurred in doing work contemplated by a contract for construction of a building, where the contract provides that all extra work shall be only on the order of the engineers, in writing, such an order or approval must be in writing, for the contractor to recover.
The Brasher case is to the effect that where one agrees to do for a fixed sum a thing possible to be performed, he will not be excused or be entitled to additional compensation, because unforeseen difficulties are encountered.
The statute in question' reads as follows:
“No contractor shall be liable for destruction or deterioration of or defects in any work constructed, or under construction, by him if he constructed, or is constructing, the work according to plans or specifications furnished to him which he did not make or cause to he made and if the destruction, deterioration or defect was due to any fault or insufficiency of the plans or specifications. This provision shall apply regardless of whether the destruction, deterioration or defect occurs or becomes evident prior to or after delivery of the work to the owner or prior to or after acceptance of the work by the owner. The provisions of this Section shall not be subject to waiver by the contractor. Acts 1958, No. 183, § 1, as amended Acts 1960, No. 84, § 1.”
A mere reading of the statute shows clearly that it applies only in a case where the cause of defective work was due to the plans and/or specifications supplied by the *197 party for whom the construction is being done. Here, the post-j etting was due solely to the Contractor’s subcontractor in failing to drive the pilings straight, as required by the plans and specifications; or to the negligence or incompetence of the subcontractor.
The Contractor could have pulled the pilings and re-driven them, but instead chose “post-jetting” to correct the subcontractor’s error, for which the Levee Board cannot be expected to pay.
The effect and import of LSA-R.S. 9:-2771 was thoroughly discussed in the recent case of Barnhill Brothers, Inc. v. Louisiana Department of Highways, 147 So.2d 650 (Ct.App. 1st Cir.). In that case the court held that under a contract specifically providing that contractor would replace all defective work as required by the Highway Department, prior to final acceptance of the structure, defective work did not include any defect (that was) not due to the plans and specifications; and that contractor, which complied in every detail with the plans and specifications, had fulfilled its obligations under the contract; and contractor, unaware of any defect in the construction, was not liable for defective work.
It is not difficult to conclude that the disparity between the Contractor’s lowest bid and that of the two competing highest bidders was due to the latter’s understanding and knowledge that any realignment of piling made necessary by their neglect or improper workmanship, would be at their risk and expense, for which they included such contingency in their higher bids.
Since the expert testimony is overwhelmingly in favor of the Levee Board that Contractor could have fully informed itself of the known subsurface conditions; that it sub-let the work to a piling subcontractor whose inexperience or negligence resulted in the improper driving of the piles in the first place; and that the Levee Board at no time agreed to pay for the cost of correcting the subcontractor’s defective work; the judgment of the lower Court in Levee Board’s favor is affirmed; Contractor (Plaintiff-Appellant) to pay all taxable costs in both courts.
Affirmed.