FINDINGS OF FACT AND CONCLUSIONS OF LAW
 

 BEER, District Judge.
 

 To the extent that the following findings of fact contain conclusions of law, or the conclusions of law contain findings of fact, they are so adopted.
 

 Findings of Fact
 

 1. These suits involve claims brought by the City of New Orleans acting through New Orleans Aviation Board (“NOAB”). Basically, the claims relate to certain asphalt overlay projects performed at separate but closely related times on the North-South and East-West runways at New Orleans International Airport. The North-South project began in 1976 and continued through September, 1977. The East-West project began in late 1977 and continued into November, 1978.
 

 2. NOAB initially sued Vicon, Inc. (“Vi-con”), the contractor on both projects, and its surety, Reliance Insurance Company (“Reliance”), in state court. Those proceedings were removed to this court in December, 1979, and January, 1980.
 

 3. Thomas B. Catchings and Associates, succeeded by Laurence L. Lambert and Associates, and, thereafter, succeeded by Laurence L. Lambert, C. E. (“Lambert”), were the engineering firms successively (and con
 
 *1231
 
 tinuously) engaged to perform services as project engineer on both projects.
 

 4. Delta Testing and Inspection, Inc. (“Delta”) designed the so-called “job mix” with respect to the asphalt and was generally responsible for performing various testing services and functions on both projects.
 

 5. Southland Oil Company, Inc. (“South-land”) supplied the liquid asphalt used by Yicon in the preparation of the asphalt mix on both projects.
 

 6. During the course of this litigation, various insurers were added as defendants. These include Northbrook Insurance Company (“Northbrook”), the insurer of Lambert, Independent Laboratories Assurance Company, Ltd. (“Independent”), the insurer of Delta, and Fidelity & Casualty of New York (“Fidelity”), the insurer of Southland.
 

 7. The Federal Aviation Administration (“FAA”), which provided grant funds to finance portions of each runway project pursuant to the Airport and Airway Development Act of 1970, 49 U.S.C. § 1701, et seq., was sued as a third party defendant by the original defendants.
 

 8. In September, 1976, the City advertised for bids for the restoration of the pavement on the North-South runway. In conjunction with this action, Lambert was retained as the engineer on the project under a contract between Lambert and the NOAB. Detailed plans and specifications were prepared by the engineer consistent with current FAA specifications. These were then made available to bidders and ultimately became part of the construction contract. Vicon was the successful bidder for a proposed price of $1,601,024.13 based in part on estimates of the quantities of asphalt materials to be supplied. The contract between Vicon and NOAB was executed October 22, 1976. Delta was appointed the testing laboratory for the project under the provisions of a separate contractual agreement with NOAB.
 

 9. In September, 1977, NOAB accepted bids for the restoration of the pavement on the East-West runway. In conjunction with this action, Lambert was retained as the engineer on the project under a contract between Lambert and NOAB. Detailed plans and specifications were prepared by the engineer consistent with current FAA specifications. These were then made available to bidders and ultimately became part of the construction contract. Vicon was the successful bidder for a proposed price of $3,378,545.89 based in part on estimates of the quantities of asphalt materials to be supplied. The contract between Vicon and NOAB was executed September 13, 1977. Delta was appointed the testing laboratory for the project under the provisions of a separate contractual agreement with NOAB.
 

 10. Reliance provided performance and payment bonds in behalf of Vicon on the North-South and East-West runway projects. Those bonds were executed as integral parts of the contracts and were at risk in the amounts provided for in the contracts.
 

 11. On the North-South runway job, the plans and specifications called for the placement of an asphalt base course, an asphalt wearing course and a covering porous friction course. On the East-West runway, a base course and wearing course were specified. On both jobs, the liquid asphalt that was specified was furnished by Southland.
 

 12. Premature failures occurred on both the North-South and East-West runways which rendered the runways unfit to provide the service required under applicable safety regulations and considerations. The failure on each runway became apparent shortly after the acceptance of the jobs. Although failures occurred on both the runways, the mechanisms by which the runways failed were, in some ways, different. Failures occurred primarily in the wearing courses — or P — 401 layer — of each runway.
 

 13. The porous friction course (“pfc”) was the top layer of asphalt mixture placed by Vicon on the North-South runway. It was designed to provide traction for takeoffs and landings and to facilitate the runoff of rainfall. Immediately after the completion of the North-South runway job, problems developed in the pfc. When air
 
 *1232
 
 planes landed on the runway, aggregate in the pfc would be dislodged by the airplane wheels and created a dangerous condition to jet aircraft. This failure of the aggregate to remain part of the pavement could be described as “ravelling,” a situation in which, the aggregate becomes separated from the asphalt. This loose aggregate on the runway created a hazard because the loose material could be ingested into a jet engine. In an attempt to correct this problem, an emulsion was laid on a portion of the runway in October, 1977. The problem of aggregate pick-up subsided sometime after the emulsion was placed on the pfc, although the lessening of the problem was due, in part, to the onset of cooler weather.
 

 14. The North-South runway developed further problems in the summer of 1978. When aircraft took off from the runway, the blasts of jet engines were responsible for blowing quantities of asphalt out of the runway, leaving potholes several inches deep. These holes began to appear in July, 1978, and their appearance increased in frequency thereafter. In addition, depressions began to appear in the pfc, evidencing a lack of cohesion in the asphalt mixture below the surface. It was discovered that sections of the wearing course (below the pfc) had deteriorated to the point where the consistency of the wearing course was that of loose aggregate held down only because of the presence of the porous friction course.
 

 15. The material below the pfc was wet or damp, and it was essentially confirmed that “stripping,” a process in which the asphalt is stripped from the aggregate in the presence of water, had occurred. The NOAB was required, thereupon, to institute daily inspection and repair operations because of the frequent appearance of depressions and potholes on the runway.
 

 16. Very soon after the East-West runway was completed and accepted, “ravelling” began to occur on that runway. Loose rocks broke apart from the asphalt pavement in the trafficked areas. More or less continuous sweeping operations became necessary. Thus, a studied consideration of the reasons for the apparent deterioration condition of the asphalt was required almost immediately after it went into service.
 

 17. The asphalt on the East-West runway appeared brown, rather than black. Aggregate was ravelling out of the surface. The ravelling was accelerated at joints between lanes and the joints could be observed as deteriorating along the entire length of the runway. Foreign material, including sticks, roots, pieces of metal, bolts, a beer can, and clay balls ravelled out of the asphalt. Small holes developed where clay balls were washed away by rain.
 

 18. Asphalt concrete is a composition of various mineral aggregates and asphalt cement. The aggregate includes gravel, crushed rock or similar sized material, coarse and fine sand, and “filler” material. These materials are mixed in specific proportions and heated in an asphalt plant to a specified temperature. The asphalt mixture is thereafter conveyed to the job site, where it is laid with the use of spreaders in lanes of designated width and thickness and compacted with the use of rollers.
 

 19. The specifications permitted Vicon to select certain of the materials to be included in the asphalt mixture, so long as the general requirements of the specifications were complied with. Vicon chose to use a Louisiana “chert” gravel in the mix. In addition, the specifications generally mandated the use of asphalt cement of a certain grade, but permitted the contractor to obtain the asphalt cement from any source so long as it complied with the minimum requirements of the specifications. Vicon purchased the asphalt cement that was incorporated into the mixture from South-land.
 

 20. The various materials selected by the contractor were to be submitted to the testing laboratory, Delta, for testing. The results of these tests were to be reported to the contractor, the engineer, the NOAB, and the FAA. The tests were required to determine whether the runway materials satisfied the minimum requirements of the specifications.
 

 
 *1233
 
 21. The specifications on both jobs provided the boundaries of the proportions of the materials that could be specified in the job mix design. As to any size aggregate or the proportion of liquid asphalt, the engineer and testing laboratory were permitted to choose a proportion falling within these boundaries. Once percentages were established in the job mix design, the specifications required that the asphalt mix be produced in those percentages, but allowed deviations according to “tolerances” established in the specifications.
 

 22. The bid documents and specifications were changed to allow the substitution of a drum dryer mixer rather than a batch plant for mixing the asphalt as long as the results were consistent with the job specifications. The same arrangement covered the East-West runway job. In a drum dryer mixer, the process of heating, drying and mixing the aggregates occurs simultaneously with the introduction and mixing of the liquid asphalt. The aggregates are transported on belts, in appropriate proportions, to an entry point at the head of a large turning drum. Flites within the drum lift the aggregates and drop them through a flame that shoots into the drum from a burner that is located at the head. Asphalt is introduced into the mixture at a point somewhat removed from the flame through a pipe that enters the drum. The asphalt and aggregates are mixed in the turning drum, heated to specified temperatures, exit the drum and are conveyed to a storage silo. The mixture remains in the silo until it is dumped into trucks for weighing and transportation to the job site.
 

 23. Vicon obligated itself to perform the work in reasonable conformity with the plans and specifications. The plans and specifications were made a part of the contract. The specifications set forth a number of requirements applicable to the process of mixing and heating the asphalt mixture, which were applicable to batch plants or continuous plants.
 

 24. The mixture was to be of aggregates and asphalt in quantities that complied with the specified tolerances. The mixture was to have no more than .5 per cent moisture content. The aggregate used in the mixture was required to be free from clay balls, organic matter, and other deleterious substances. The pavement was required to be compacted to a specified density and to be of uniform texture. Joints were to be constructed to the same density and texture as other areas of the pavement. Field density tests were to be performed at least twice daily. To ensure that these criteria were satisfied, Vicon provided a guarantee of the work to the NOAB. The guarantee in each contract stated:
 

 ARTICLE 7. GUARANTEE
 

 All work as herein specified and/or as indicated on the plans shall be guaranteed against defects in materials and workmanship for a period of one (1) year, unless otherwise noted, from the date of final acceptance of the work. The Contractor shall, within a reasonable time after receipt of written notice thereof, make good any defects in materials or workmanship which may develop during said one year period, and any damage to other work caused by such defects or the repairing of same, at his own expense and without cost to the owner.
 

 25. Identical contracts were executed between the NOAB and Lambert for engineering services on both runway projects. These contracts set forth the responsibilities of the engineer. Among these requirements was the obligation of Lambert to “(p)repare detailed construction drawings (and) specifications . . . based on guides furnished the engineer by the Owner and the FAA. . . . ” The specifications were to be prepared using “the application of sound engineering principles with a high degree of economy. . . . ” Additionally, in the construction phase of the contract, Lambert was to perform the duties and discharge the responsibilities stated in project specifications after receiving written authorization to proceed with constructions. The specifications, prepared by Lambert using the FAA guide, provided:
 

 50-01 AUTHORITY OF THE ENGINEER. The engineer shall decide any
 
 *1234
 
 and all questions which may arise as to the quality and acceptability of materials furnished, work performed, and as to the manner of performance and rate of progress of the work. He shall decide all questions which may arise as to the fulfillment of the contract on the part of the contractor, and the rights of different contractors on the project. The engineer shall determine the amount and quality of the several kinds of work performed and materials furnished which are to be paid for under the contract.
 

 26. Lambert had the authority and the responsibility to determine the compliance of the material with the plans and specifications. He could accept or reject the material. He was required to determine the acceptable quantities of work completed by the contractor based on measurements taken by the engineer or his assistants. The engineer could require the removal and replacement of any pavement not conforming to the specifications. All material not in conformity with the specifications was to be deemed unacceptable and removed unless the engineer determined them to be acceptable, documented his determination and recommended that acceptance provide for an adjustment in the contract price pertaining to the affected portion.
 

 27. The testing laboratory was responsible for the preparation of the job mix designs, testing of raw materials, and testing of the asphalt mixture produced at the plant. Delta was obligated to test and record the temperature of the material in selected trucks leaving the plant and going to the job site. Samples of the material were to be taken from various trucks and analyzed in an “extraction test” to determine whether the percentage composition of the ingredients was within tolerance. “Briquettes” were compacted under a specified procedure known as the Marshall method in the planet laboratory. Tests were run on these briquettes, including a specific gravity test to determine the densities that could be achieved with the mix. Field cores taken from the job site were tested for density and compared to the briquettes. The specifications required that these cores have densities at least 98 per cent as great as the compacted briquettes. The other tests performed on the briquettes were designed to determine the compliance of the mix with other specification requirements, such as the percentage of air voids in the compacted briquettes. The test results were to provide a basis for quality control. Written test reports were to be submitted to the engineer and were also to be sent to the contractor, Vieon, the FAA and the NOAB. Neither oral nor written results of the tests were available immediately since several hours were required to complete the tests.
 

 28. Delta’s test reports indicated that Vieon essentially achieved the 98 per cent density requirement on the North-South runway and on much of the base course laid on the East-West runway. The reports indicated that an average density of about 96.5 per cent was achieved on the wearing course of the East-West runway. These results misrepresented the densities actually achieved on the runways.
 

 29. To ensure that the test results appeared to comply with the specifications, Vieon employees used a machine to locate spots on the runway from which the field cores were then extracted. Sound construction practice required that these locations should have been selected on a random- basis. Vieon employees selected approximately five field cores per day from the areas having the greatest density. If areas of the pavement were designated by representatives of the engineer for coring, and the pavement in these areas appeared to be poorly compacted, those cores were discarded.
 

 30. Delta did not report the results of all of the density tests run on the samples submitted to it. A Delta employee who performed the tests ran density tests on all of the field cores delivered by the contractor, but reported only the two best results. The results of tests run on the remaining samples were discarded. Thus, the reports submitted to the engineer, the FAA and the NOAB did not accurately depict the densities achieved on the pavements.
 

 
 *1235
 
 31. Density tests run on samples from the pavements by various laboratories during the investigation of the failures established that the densities were lower than reported by Delta. On the East-West runway wearing course, the average density of field samples was 94.2 per cent of the average Marshall briquette density reported by Delta. A number of samples had densities that were less than 90 per cent of the average briquette density. On the North-South runway wearing course, the densities of field samples tested subsequent to the jobs was about 95 per cent.
 

 32. The maximum air void content allowed by the specifications for the briquettes made with the mixture to be used in the wearing courses was exceeded on relatively numerous occasions so that the briquette density values used to determine compliance with the density specification were unreliable.
 

 33. Failure to achieve proper densities was a cause of the serious problems on both runways. Air voids in the pavement promoted weathering and aging, thus permitting the intrusion and passage through the pavement of water. This action decreased the resistance of the pavement to stripping, ravelling and deformation under load. The low densities were a cause of the runway failures.
 

 34. Laboratory tests on field samples showed that the pavement was outside the specifications on the asphalt content of the mixture. With respect to the East-West runway wearing course, a majority of samples were outside the specifications. On the East-West runway base course, a substantial per cent of the field samples were outside the applicable tolerance. On the North-South runway wearing course, about one-third of the field samples were outside the tolerance. On the base course of the North-South runway, about two-thirds of the samples were outside the tolerance.
 

 35. The Delta daily reports also indicated that the tolerances required for the asphalt content were outside of compliance. In this respect, the asphalt mix was, for at least part of the time, out of control.
 

 36. In view of the fact that the asphalt content is an important factor in determining the quality of the mix, non-compliance with the specifications for the asphalt content was a cause of the failures.
 

 37. Ravelling occurred in the joints on the East-West runway. Compaction was poor. Cores could not be taken from the joints due to the fact that the pavement being cored crumbled during the coring operation. These defects were due to faulty joint construction. Faulty joint construction was a part of the runway failures.
 

 38. Roots, sticks, pieces of wire and pieces of metal in excessive amounts formed part of the pavement. Holes developed in the surface of the East-West runway because of the presence of clay balls in the mixture, which were dissolved after being exposed to rain. These factors were a part of the runway failures.
 

 39. The asphalt cement used in the runway jobs was excessively hardened. The material had hardened more than would ordinarily be expected. This excessive hardening is attributable to overheating at the plant. The excessive hardening of the asphalt was a cause of failures of both runways.
 

 40. Unacceptable asphalt mixture was laid when it arrived at the job and was, thereafter, covered over, leaving an unstable base.
 

 41. Louisiana “chert” aggregate was used without an antistripping agent. Chert aggregate has a known tendency to strip. Lambert knew of the need for an antistrip agent, thought — but did not check on the fact that — antistrip agent had been used, and learned, after the completion of the jobs, that an antistrip agent was not used.
 

 42. A cause of the failure on the North-South runway was excessive moisture in the pavement, leading to the widespread stripping in the layer below the pfc. The reason for the presence of this moisture was the failure of Vicon to remove the moisture from the aggregates in the mixing and heating process. Production from a drum dryer mixer needs to be reduced when the
 
 *1236
 
 cold aggregates contain excessive moisture. Vicon failed to reduce the moisture content to comply with the specifications.
 

 43. Vicon’s failure to meet the specifications was attributable to inefficiencies in the Vicon plant operation and the mixing process inside the drum dryer mixer.
 

 44. The East-West runway pavement was of an inadequate density, had inadequate asphalt content, an improper percentage of crushed aggregate, and an excessive amount of foreign material. This information was made available to representatives of Reliance and Vicon.
 

 45. Except for the porous friction course on the North-South runway, Vicon was paid for asphalt placed on the runways according to the weight of the materials delivered. Thus, the contract price varied with the quantity of asphalt mixture required to construct the pavements.
 

 46. Vicon obtained overpayments for asphalt from NOAB. The weigh ticket printing machine at the Vicon plant permitted the scale operator to turn the key in a way that caused the machine to print a net weight on the weight ticket that was greater than the actual weight of the asphalt in the truck. Manipulation of the ticket, printing machine was routine. Vicon submitted and was paid for tickets for nonexistent deliveries. Representatives of the engineer participated in this scheme.
 

 47. In connection with the scheme noted above, Lambert’s representative received cash payments and other gifts.
 

 48. Lambert failed to maintain proper quality control. He knew or should have known of significant and frequent deviations in the asphalt content of the mix and that the asphalt content was out of specification.
 

 49. The unacceptability of the job mix was obvious to Lambert’s employees at the laydown site. Yet, no satisfactory action was taken by Lambert to correct the problems. Lambert did not ensure that the joints were properly constructed. The on-site inspectors employed by Lambert were unsatisfactory.
 

 50. Representatives of Lambert were required to choose the location of field cores to be tested for density. They permitted the selection of unrepresentative samples. Lambert did not ensure that the cores were marked to show the locations from which they were extracted.
 

 51. Lambert was obligated to certify the quantities of material delivered to the job site. However, an accurate record of deliveries was not kept. Fraudulent tickets were purposely accepted and approved by the engineer’s supervisor. On the East-West runway, Lambert accepted estimates provided by Vicon and approved partial payments for approximately 105,000 tons of asphalt, when the total amount ultimately claimed as delivered by Vicon, including the fraudulent claims, was approximately 92,-000 tons.
 

 52. Lambert relied on others rather than properly perform the duties he was employed to perform.
 

 53. Delta was employed to prepare the job mix designs, test the materials to be used in the job, and perform certain tests at the plant site on behalf of the NOAB. Delta was to perform under the supervision of Lambert and was to report to Lambert.
 

 54. Delta employees engaged in testing procedures and reporting procedures that misrepresented the densities achieved on the pavement.
 

 55. Southland products were not a cause of the runway failures.
 

 56. The FAA guidelines did not fully conform to all of the most recent technological advances in asphalt pavement construction but were fully sufficient to produce a well constructed airport runway.
 

 57. Reliance was aware of the deterioration and threatened failure of the North-South and East-West runways at about the same time that Vicon was placed in default. Reliance executed a joint control agreement with Vicon in the fall of 1978 after Vicon experienced financial difficulties. Through an agent, Reliance participated in the Vicon operation on an ongoing basis. Reliance knew of the premature failure on the
 
 *1237
 
 North-South runway shortly after it began to occur. Reliance was involved in the operation of Vicon when the East-West runway experienced premature deterioration beginning in November, 1978.
 

 58. By the time that the runway failures became apparent, Reliance was in joint control of Vicon.
 

 Conclusions of Law
 

 1. Removal jurisdiction exists pursuant to 28 U.S.C. § 1441. Original jurisdiction exists as to any claim on a bond required under a law of the United States. 28 U.S.C. § 1352. The bond furnished by Reliance was required under regulations promulgated pursuant to the Airport and Airway Development Act of 1970, 49 U.S.C. § 1701,
 
 et seq.
 
 Pendent jurisdiction exists as to the other claims asserted by the NOAB. Ancillary jurisdiction exists as to third party claims and cross-claims.
 

 2. Construction contracts are to be performed in a skillful, careful, diligent and good workmanlike manner.
 
 Hebert v. Pierrotti,
 
 205 So.2d 888 (La.App. 2nd Cir. 1968). Failure to comply with these obligations result in contractor liability for damages suffered by the owner. LSA-C.C. arts. 2762, 2769. Article 2762 expressly provides for the liability of a contractor when a building he has constructed is defective. It is applicable to a project for the construction of asphalt pavement.
 
 Town of Winnsboro v. Barnard & Burk, Inc.,
 
 294 So.2d 867, 874 (La.App. 2nd Cir.),
 
 cert. denied,
 
 295 So.2d 445 (1974);
 
 Murphy Corporation v. Petrochem Maintenance, Inc.,
 
 180 So.2d 716, 721 (La.App. 1st Cir.),
 
 reh. denied,
 
 (1965).
 

 3. The NOAB has demonstrated by a preponderance of the evidence that the failures occurring on both runway projects were due to defects in the workmanship or materials provided by the contractor.
 
 A & M Pest Control Service, Inc. v. Fejta Construction Co.,
 
 338 So.2d 946, 949 (La.App. 4th Gir. 1976). The defective performance of the contractor included its failure to comply with the specifications dealing with the density of the pavement and the asphalt content of the mix, the improper construction of joints, the excessive hardening of the asphalt cement, the contamination of the mix, and failure to adequately remove moisture from the mix.
 

 4. The runway failures occurred within a year of the acceptance of the jobs and were caused by defective materials and workmanship.
 

 5. The failures resulted from faulty workmanship and inadequate materials, not from a defect in the specifications. LSA— R.S. 9:2771, et seq. does not operate to relieve the contractor of liability who is incompetent, negligent, or fails to perform in accordance with the specifications.
 
 Pittman Construction Co. v. Board of Levee Comm’r.,
 
 169 So.2d 192 (La.App. 4th Cir. 1964),
 
 cert. denied,
 
 247 La. 345, 170 So.2d 865 (1965). Counsel for Vicon and Reliance refer the court to
 
 Pittman Construction Co. v. Housing Authority of New Orleans,
 
 169 So.2d 122 (La.App. 4th Cir.),
 
 reh. denied,
 
 (1964),
 
 writs refused,
 
 (1965). I find this case inapposite to the present factual pattern. The plans provided by the FAA were neither “defective, inadequate or insufficient.”
 

 6. When defective materials are involved in a job, the contractor is ordinarily liable.
 
 Manzanares v. American International Forest Products, Inc.,
 
 389 So.2d 1142, 1147 (La.App. 3rd Cir. 1980);
 
 A & M Pest Control Service, Inc.
 
 v.
 
 Fejta Construction Co.,
 
 338 So.2d 946, 951 (La.App. 4th Cir. 1976). Moreover, the contractor can be relieved of liability only “where those materials are
 
 specifically
 
 called for by the plans and where the contractor has no knowledge that the materials are defective.”
 
 West Bros. of DeRidder, Louisiana, Inc. v. Morgan Roofing Co.,
 
 376 So.2d 345, 348 (La. App. 3rd Cir. 1979). In those cases where the contractor is relieved of liability, the agent or owner specifically selected the faulty materials.
 
 Clean Sweep, Inc. v. Delta Container Corporation,
 
 354 So.2d 1062, 1063 (La.App. 4th Cir. 1978). In this case, Vicon selected the asphalt and the chert aggregates used in the job. To the extent that these materials contributed to the run
 
 *1238
 
 way failures, Vicon cannot avoid liability. This conclusion is also mandated by the undertaking of Vicon to guarantee all materials used in the project.
 
 New Orleans Unity Society v. Standard Roofing Co.,
 
 224 So.2d 60, 63 (La.App. 4th Cir.),
 
 app. denied,
 
 254 La. 811, 227 So.2d 146 (1969). Consequently, Vicon is liable under the guarantee for the damage incurred by the NOAB as a result of the failure of the materials.
 
 Id.
 

 7. The fact that the NOAB employed an engineer and a testing lab does not relieve the contractor of liability.
 
 Town of Winnsboro v. Barnard & Burk, Inc.,
 
 294 So.2d 867 (La.App. 2nd Cir.),
 
 cert. denied,
 
 295 So.2d 445 (1974), states:
 

 The fact that an owner has an engineer and testing laboratory on the job does not relieve a contractor of the contractor’s duty to perform the work in a workmanlike manner in accordance with the plans and specifications.
 

 ******
 

 The defects here resulted from the manner in which the work was done. That the engineering firm and testing laboratory may have also failed in their obligations of inspections and supervision owed to the Town does not relieve the contractor of its obligations to the Town.
 
 Id.
 
 at 875.
 

 8. The final “acceptance” of the work by the engineer does not exonerate the contractor of liability. The acceptance was designated merely to begin the running of lien periods. The “waiver” result is specifically precluded by the terms of the contract. The waiver clause provides:
 

 70-18 NO WAIVER OF LEGAL RIGHTS. Upon completion of the work, the owner will expeditiously make final inspection and notify the contractor of final acceptance. Such final acceptance, however, shall not preclude or estop the owner from correcting any measurement, estimate, or certificate made before or after completion of the work, nor shall the owner be precluded or estopped from recovering from the contractor or his surety, or both, such overpayment as may be sustained, or by failure on the part of the contractor to fulfill his obligations under the contract. A waiver on the part of the owner of any breach of any part of the contract shall not be held to be a waiver of any other subsequent breach. The contractor, without prejudice to the terms of the contract, shall be liable to the owner for latent defects, fraud, or such gross mistakes as may amount to fraud, or as regards the owner’s rights under any warranty or guaranty.
 

 The acceptance did not constitute a waiver because latent defects existed in the work and the test results did not fully or accurately reflect the extent to which Vicon deviated from the specifications. The evidence supports the NOAB’s contention that it was never made aware of the true test results during the course of construction and, thus, had insufficient knowledge regarding the product delivered.
 
 Michel v. Efferson,
 
 223 La. 136, 65 So.2d 115, 119 (1953);
 
 C
 
 — B
 
 Construction Co. v. Kilpatrick,
 
 366 So.2d 990, 992 (La.App. 1st Cir. 1978),
 
 reh. denied,
 
 (1979).
 

 9. Lambert failed to discharge his responsibilities under the engineering contract and the specifications. The engineer is liable for the damages ensuing from his failure to adequately perform the engineering contract. Article 1930 states that “(t)he obligations of contract (contracts) extending to whatsoever is incident to such contracts, the party who violates them, is liable, as one of the incidents of his obligations, to the payment of the damages, which the other party has sustained by his default.” This principle is applicable to architects and undertakers in connection with construction contracts. LSA-C.C. arts. 2762, 2769.
 

 10. The NOAB argues that because the engineer undertook to perform a contract under FAA guide specifications that are used nationally, expert testimony from outside the immediate locality has probative weight. The court, however, finds it unnecessary to adopt this standard in light of the evidence, and, thus, the same locality rule is applicable.
 
 Maloney v. Oak
 
 
 *1239
 

 Builders, Inc.,
 
 224 So.2d 161, 168 (La.App. 4th Cir.),
 
 reh. denied,
 
 (1969). Lambert’s conduct during both runway projects was substantially below what normally would be expected under local practice. The experts called by Northbrook testified that it would be unusual for a testing lab to usurp any of the engineer’s responsibilities or for the engineer’s inspectors to receive tonnage tickets in the field from the contractor’s representatives. Local practice also mandates that the project engineer have the ultimate responsibility to accept or reject the materials. Lambert did not exercise this authority. Lambert failed to ensure that all tests were conducted in accordance with the specifications.
 

 11. The terms of the engineering contract and the specifications incorporated therein are binding on Lambert. The court rejects assertions by Lambert that the written engineering contract was varied by any subsequent oral agreement of the parties. The burden was on Lambert to prove a modification of the written contracts, but Lambert failed to provide any evidence in support of this claim other than his own uncorroborated testimony, which was denied by other principals in the case. The contract constitutes the law between the parties. LSA-C.C. art. 1945;
 
 Miller v. Lancer Pools Corp.,
 
 207 F.Supp. 809, 812 (E.D.La.1962);
 
 Liberto v. Villard,
 
 386 So.2d 930, 934 (La.App. 3rd Cir. 1980).
 

 12. The misrepresentations of asphalt deliveries which occurred during both projects on a per ton basis resulted in over-payments to Vicon. Vicon is liable for the overpayments in addition to the other damages incurred by NOAB. The two categories of loss are independent. Lambert is also responsible to the NOAB for the over-payments. All work completed under the contract was to be measured by the engineer. The quantities measured formed the basis for payment unless revisions were made by the engineer. The final payment was based in part on the estimates of quantities actually delivered. Lambert’s representative, while acting in the course and scope of his employment, participated in a scheme to knowingly receive and certify the fraudulent tickets for payment. As to “phantom” tickets that were unknowingly accepted by Lambert inspectors, there was a failure in his duty to exercise reasonable supervision over the asphalt operation to certify the quantities delivered.
 

 13. Delta failed in its contractual obligation to properly perform the testing function for the NOAB. Delta misrepresented the densities achieved on the North-South and East-West pavements by improperly selecting results to be reported, failed to perform and/or report certain materials tests and failed to promptly report results that were out of specification. The failures, omissions and improper actions of Delta subject it to liability under its agreement with the NOAB and under Louisiana law.
 
 Town of Winnsboro v. Barnard & Burk, Inc.,
 
 294 So.2d 867 (La.App. 2nd Cir.),
 
 cert. denied,
 
 295 So.2d 445 (La.1974).
 

 14. The evidence did not establish that the Southland asphalt was latently defective or that it was not fit for the purposes for which it was sold. Thus, the Southland product was not a cause of the runway failures.
 

 Damages
 

 1. A party injured by a contractual breach is entitled to be placed in the same position as he would have been in had the contract been properly performed. LSA-C.C. art. 2769;
 
 Harelson
 
 v.
 
 Parish of East Baton Rouge,
 
 272 So.2d 382, 385 (La. App. 1st Cir. 1972). The damages assessable for the runway failures include amounts expended to properly complete the work in excess of the contract price.
 
 Keating v. Miller,
 
 292 So.2d 759, 763 (La.App. 4th Cir. 1974),
 
 amended and aff’d after remand,
 
 339 So.2d 955 (La.App. 4th Cir. 1976),
 
 writ refused,
 
 341 So.2d 904 (1977);
 
 Keating v. Miller,
 
 339 So.2d 955, 956 (La.App. 4th Cir. 1976),
 
 writ refused,
 
 341 So.2d 904 (1977);
 
 Moore v. Usrey & Usrey, 52
 
 So.2d 551, 554 (La.App. 2nd Cir. 1951).
 

 2. Damages are assessable against Vi-con, Reliance, Lambert and Delta
 
 in solido
 
 
 *1240
 
 for both runway projects. Northbrook and Independent are liable
 
 in solido
 
 with their principals.
 
 Town of Winnsboro v. Barnard & Burk, Inc.,
 
 294 So.2d at 883-86.
 

 3. The cost of renovating the North-South runway was $2,879,434.98. The NOAB is also entitled to recover the sum of $73,748.58, which represents the cost of emergency repairs necessitated by the failure of the runway.
 

 4. Defendants are entitled to the following set-offs:
 

 Centerline lights $418,415.00
 

 Engineering services for center-line lights 29,289.00
 

 Salvage value of asphalt removed from the runway 70,000,00
 

 $517,704.00.
 

 The total amount recoverable for the failure of the North-South runway is $2,435,-479.56.
 

 5. Vicon, Reliance, Lambert and his insurer, Northbrook, Delta and its insurer, Independent, are liable
 
 in solido
 
 for the damages sustained by the NOAB due to the failure of the East-West runway. The cost of renovation was $1,502,788.84.
 

 6. Defendants are entitled to the following set-offs:
 

 Grooving of the runway $105,700.00
 

 Salvage value of rotomilled asphalt 36,600.00
 

 Retainage 161,021.00
 

 $303,321.00.
 

 The total amount recoverable on the East-West runway project is $1,199,467.84.
 

 7. Vicon, Reliance, Lambert and Lambert’s insurer, Northbrook, are liable
 
 in solido
 
 to the NOAB for the sum of $250,000.00. This sum represents my best effort to determine the overpayments made to Vicon as the result of the shortweighing and other schemes.
 

 8. The terms of the contract and construction bond on both of the runway projects provided that the NOAB be protected “from all loss or expense of any kind, including costs of court and attorneys’ fees, made necessary or arising from the failure, refusal or neglect of the aforesaid Vicon, Incorporated (to comply with its obligations).” Thus, Vicon and Reliance are obligated for the attorneys’ fees and legal expenses incurred in this case.
 
 [1]
 

 9. NOAB maintains that under Louisiana law, the refusal of an insurer to pay a claim within 60 days, without probable cause, subjects the insurer to the imposition of a penalty. LSA-R.S. 22:658. However, this statutory provision requires that the failure to pay must be arbitrary, capricious and without probable cause.
 
 McManus v. Travelers Ins. Co.,
 
 360 So.2d 207, 211 (La.App. 3rd Cir.),
 
 reh. denied,
 
 (1978). I find that these elements are not proven by a preponderance of the evidence.
 

 Counsel for NOAB is directed to prepare a judgment consistent with these findings and conclusions.
 

 [1]
 

 . In view of this conclusion, all counsel may be able to stipulate to attorneys’ fees and court costs. If counsel are unable to agree to such a stipulation, then this aspect of the case will be referred to the Magistrate for further proceedings.